Is U.S. v. Bey, Bey or Bey? Good morning, your honors. Brett Spitzer here from the Defenders representing Mr. Bey. At this time, I'd like to reserve three minutes for rebuttal. We have not discussed this case, but let me, as I've thought about this thing, let me be two really fine attorneys, I wouldn't usually do this, but let me tell you exactly what my issue is and you can address it and hopefully it won't threaten Mr. Zossmer for an argument he wasn't otherwise going to make, although I doubt that's possible. It seems to me, the issue here is, and I really want to make the argument about the hoodie versus the jacket, frankly, it seems to me that's a total waste of time. The officer saw somebody at night within a block, probably half a block, of where the guy played from the car with a red coat, be it a jacket or a hoodie, to me it doesn't matter, that gives him guns for, or her, I guess it was him, gives him guns for a tourist stop, especially since there's some information a gun may be involved. It seems to me when the officer sees somebody with a red jacket or a hoodie, bad turn, this officer runs for a tourist stop. He tells the person to put their hands in the air, he puts their hands in the air, and the officer sees a picture on the MDT, we don't know what the resolution is because the government didn't introduce it. The person then turns, and at that point the officer sees the person's face. Now, it seems to me that it's the government's burden here. At some point in time you can argue the reasonable suspicion dissipated because the officer actually saw the face of Bae, and had seen the face of the person who fled from the car. The government has the burden of proof they should have, it seems to me, introduced the photographic image that the officer saw at the MDT and didn't. Therefore they can't show that the officer, when they saw Bae's face, was so dissimilar in appearance that the tourist stop justification dissipated. Wouldn't he so far? Yes. But the officer did a show-up. The officer takes Bae back to where the police car was and asks the officers there, is this the guy who ran? Why shouldn't we infer from that, even though there's no framing of this, that however that MDT image appeared, it was significantly close in appearance to Bae's appearance to not dispel the officer's concern because otherwise the officer wouldn't have taken Bae back for a show-up. It's a long, rambling kind of question, but do you understand the concern? I think I do, Your Honor, and I think the answer is because according to the officer, Officer Powell, at that point he was arrested. So he went back and did a belt-and-suspend race. That's what he said when he found the gun. He said he was arrested on the cross. So you arrested my guy because he had a red jacket. The officer responds, no, I stopped him because he had a red jacket on. I arrested him because he had a gun. He's very clear about that. So at the time of the arrest, oh, so you're saying that the arrest would have occurred before they saw the photo. That's right. Okay. So I do believe that at that point, and I would remind the court, the officer, Officer Powell, is a bit of a mess in terms of his credibility, in terms of, as the government points out, he claims he didn't even see the photo the district court found. To the contrary, he claims that Mr. Bay admitted having a gun. District court finds the contrary and so forth. So I do think I would like to step back one second, though, and I agree with Your Honor or I agree with the point that Your Honor was making about the mismatch in terms of the photograph. But I do believe on the front end, on the description, this description is not distinctive enough to warrant the stop to begin with. And it's not because of the red jacket, red hoodie. I'm not going to talk about that today, actually. What I would like to talk about is how the description here, which at first blush, has some detail, right? It has the age. It has the height. It has an approximate weight. And it says red jacket or all, except for the moment, red jacket or red hoodie. And what we have to ask ourselves is, in this context, is that distinctive enough? In the context of dozens of square blocks with seven minutes of headlong flight. It wasn't a dozen square blocks, but he was caught, I'll give you the better of a doubt and say within a block. I think it was within a half a block, within probably 120 seconds of the flight. That's right. He was within the zone where he could have been found. But when we look at the adequacy of the description, we look at the entire context. Was it for arrest or for a stop? For a stop. So what you do is. . . They didn't have enough for a 30 stop? They see the 10 o'clock or 9 p.m. red herring. They see this guy. They know that the person they're looking for had on a red jacket, hoodie, whatever. It was a red leather apparel, dark pants. General idea of the height and build, black. They see a guy within a half a block, within, I'll say two minutes, which is to your benefit, I think it's quicker than that, where the car is, who is generally the same build and height and black, has the same color of apparel on. And you're saying they should just keep on going and not follow that up with an investigative stop? No, and it's not just me saying this. This is ground. So what do we have in ground? No reasonable suspicion. We have in ground a description of age, 15 to 20 years old, two men, two black men, five foot eight, six foot flat, dark hoodies. Then the police roll up on the detainees. What are they? Two black men, exact same heights, a little odd there, five, eight, six foot, dark clothing. No reasonable suspicion because, as Judge Ambrose quite cogently explained, in the context, in the middle of Philadelphia, on an evening, that is not distinctive enough to justify a stop. And really ground, only enshrined into Third Circuit law, this court's actually Judge McKee, your concurrence in the Kithcart case. That was obviously decided on probable cause. But Kithcart was certainly, the description there was more bare. That was two black men in a black sports car near the scene of a robbery that had happened within an hour or so. But the descriptions were not perfect. But what ground did was it made the important step of saying it's not just detail. I could give you a detailed description about somebody with ten fingers and two arms and two eyes and a nose. None of it matters. But if it's not the description of the guy who fled, and it's the guy with two eyes and three arms, whatever you should say, it doesn't fall across. My point, Your Honor, was what I said was two arms, two legs, non-distinctive. Almost everybody matches that. And in this context, my argument is, and really just from ground, it's really hard to push this case back to the awful ground. What should they have done? I'm sorry? When they saw a bag, back turn, red jacket, half a block, within two seconds, two minutes, I'm sorry, of the flight, what should they probably have done? They should have done exactly what the police officers did in Graves, which was decided about a year ago. And what happened there was a report of gunshots, two men in gray hoodies walking west of the scene. The officer, you know, within five minutes, a few blocks west of the scene, sees two gentlemen, two black men in gray hoodies. Perfect description match. What does he do? He follows them. He follows them for a few minutes. And what does he discover? He discovers evasive behavior. He discovers actually threatening behavior that gives support for a terrorist attack. He wasn't moving. He was standing there, back turned. Mr. Bay was walking out of a bar and had a police officer run up to him, stick a gun in his face, and say, you're my man. It's lucky he had a cool head or we could have a very different situation. That would have been very much more like Lowe. And again, it's remarkably like Brown. The defendants in Brown were coming out of a store holding coffee cups. And I'm not here to say that that fact, the fact that he was walking out of the bar, although I believe that severely undermines the rationale that Officer Powell gave, I'm going to go look at lids because somebody's going to go blend in by the jukebox, essentially. You know, you stop somebody, does that really make sense that someone, if that's what their theory is, is, you know, someone's going to walk out into the middle of Police Central, that doesn't make a whole lot of sense. But, sure, my case doesn't rise or fall on that. But it certainly tips in the balance against reasonable suspicion. So, Your Honor, I would only say in the description it's not that simple. It's not just the amount of detail. It's how distinctive it is. And I think if the court looks at Brown, it's really difficult to factually move off that case. Now, on the match, the match, our facts are better than Brown. So Brown talked about two features that did not match between the detainees and the suspects and found it dispositive in the case. One was the fact that the detainees, the people who were stopped, had full beards, and there was nothing mentioned in the description at all. The other was the fact that the detainees were 10 years older than what was described in the broadcast or the victim's report. And here, again, remarkably, the exact same two discrepancies come into play. Mr. Bay, as the court knows from our brief, the photographs are right there, has a full bushy beard and, again, doesn't look anything like the young Mr. Robinson, who, again, the police had just seen a photograph of. So we're square on with Brown. But why it gets better, why our facts are better than Brown, is the photograph, where we started off this morning. And once the photograph comes into play, any possible reasonable suspicion there was goes out the door at that moment. So as soon as Mr. Bay turns around, it's clearly he's nothing like the man who the police are seeking. And at that point, instead of, you know, the gun has to come down, let's put it that way, the gun has to come down and the officer has to stand down, the stop has to cease. Now, there is, in the few seconds I have left, I have highlighted in my brief what I think is a very important issue, and that's with respect to the high crime factor, the high crime area factor. I don't think our case rises or falls on this at all, but I do think it is an important issue. Here, there is no logical relevance whatsoever to the reputation of the area for criminal activity. All police were doing was they had a description of a known criminal and they've got to decide, does this person sufficiently match it for me to stop? That has nothing to do with the robbery rate in the area or anything else. I would urge the court to clarify that in this case because there is a danger of a reflexive image. So you're saying it's not relevant because it's an ID case in a high crime area? It's not ID on these facts. Now, it could have been relevant. If this case had gone the way Graves had gone, why is it not relevant in this case? It's not relevant here because when the police know I'm looking for this person, here's the description, and the question is, is the person I see now, does he match that description? That has nothing to do with the robbery rate. So it's not relevant? It's not relevant. It's just not logically relevant. Let me give you an example, Your Honors. These Fourth Amendment cases come in all flavors, right? So in tip cases, anonymous tip cases, a big factor there is predictive information, right? So was the information that was given over by the tipster, was it predictive in a way that would have suggested he was an insider and knew that, you know, all that sort of stuff? The courts are all aware of this. I'm not here arguing that predictive information, hey, there was no predictive information in this case, so therefore that counts against the government. That would be ridiculous. It's not relevant. Same thing here. High crime area is not relevant. So I would urge the court to make note of that. However, the court comes out on the fundamental issue of whether the stop is justified. Well, it is reflexive, the high crime area. I think that was a case out of Pittsburgh that was described, one of the reasons that the stop was justified was the high crime area. And I guess the assistant district attorney didn't know that the district court judge lived in that area, and the judge was very clear about putting on the record this is not a high crime area. Well, and I would note, Your Honor, Mr. Bay was lucky. The match here was so bad that he, I mean, he was for sure prosecuted for something else. The match was so bad he was not prosecuted for whatever Robinson did. But that's not true for a lot of defendants. You know, there's a suggestive show-up that happens after these things most often, and then you're off to the races. Then you've got an identification that was based on a show-up that's probably going to be upheld, and, you know, some bad things can happen based on those improper identifications as well. Thank you, Your Honors. I see my time is up. Thank you. Good morning, Your Honor. Robert Salzman on behalf of the government. You brought Mr. Skipper in because they kind of balance out things. Last time you brought McSwain, so they think, okay, they're McSwain, we'll bring Skipper. It's a good pattern, Your Honor. So I'll address Your Honor's question about what I call the dissipation issue. I'll get back to the description. I have time. But just one sentence on the description because it's important to the dissipation question. The situation that Officer Powell faces when he first confronts the defendant is, by all appearances, he has found the right person. Wait, did you look at the photos? Yes, I did, and I'm going to actually hold them up in case. I'm looking at it right now. I absolutely have. So let's look at it this way, Your Honor. By all appearances, he found the right guy? Your Honor, when Mr. Bay is stopped, he's within a block of where it took place within mere minutes. He's in the correct direction. He's wearing a red coat. He's having a head transplant and a skin tone reduction. We are looking at this, Your Honor, from the perspective of the officer at the time in a chase in a pressured environment. What the officer sees is here's a guy who it would appear is the guy they're looking for. He's leaving a bar and he's not out of breath. He is. How do you move this from Brown to Mr. Powell? Well, there are critical differences from Brown. Most importantly is the red jacket. But before I get to that, what Officer Powell does is he uses what this court and the Supreme Court have often said we will defer to, which is police judgment. Officer Powell has made the judgment. A guy has run. It's ten at night. Most people are gone. They're at home at that time. He goes to the spot. Ten o'clock at night, most people are at home. But what Officer Powell does... Are you a teenager? I'm not a teenager anymore, Your Honor. Are you talking to adults? They are. Do you know where they are at ten o'clock at night? Usually. They may not be the most interesting person. If you're going to run a police judgment, didn't the district court find this police officer less than credible? No, absolutely not, Your Honor. Who's the judge? The police officer said that the guy said something like, where's the gun? And they said, oh, the gun. Why do you have to know that? It's in my head. And the district court clearly did not credit any of that. We're bouncing around here, Your Honor, but to address that, the court said I don't credit the officer on this point. The court never said no. But here's what's most interesting about it, Your Honor. This went to trial, and the court did not exclude that testimony. Officer Powell testified at trial that the defendant made that statement. And not only did he testify to it at trial, it's in the appendix, but Officer Cherry, who was the other officer at the scene, heard the same thing, and he testified to it too. In fact, the core of the defense at trial was that the reason these officers couldn't be believed was because of that statement and it not being in the rest report. Interestingly, at trial, the defense never went with this hoodie business, the distinction of the hoodie versus jacket. That wasn't where they took their stand. They argued these officers were corrupt, they planted the gun, and the reason the jury should conclude that they were corrupt was because of that statement and the fact that it wasn't in the arrest report. The jury unanimously convicted the defendant beyond a reasonable doubt. They didn't go for that. So this does not carry the weight that the defendant now is suggesting that this is an incredible officer. That's not what the jury found on this very issue involving the statement. Now, moving back to the situation they face. Again, we have to look at the totality of the circumstances. It's 10 at night, a person is wearing the right clothing in the right place, based on the officer's intuition, and this, Your Honor, is the distinction with Brown. The officer has made a judgment, which we respect, that in this area, if you're running and you want to blend in, there's one place to go where there will be a number of people at that time, and so that's the spot he goes to. He drives against traffic to get there because he wants to get there as fast as he can, and he's made the judgment that there's the place to go. He sees them from the back. From the back, it's the right build, the right gender, the right race, the right jacket. Everything is right, and then Mr. Bay turns around. Now, if we rely on what the district court said, Officer Powell had seen a picture by that point. Now, the court, I don't know if it rejects the testimony or overlooks it, but Powell says, I was looking at a picture for a minute, and someone said, that's not the guy, but let's take what the court said. He saw a picture of Robinson. We don't know exactly which picture, but what we have in the record is a picture of Robinson from five months later, and we also have a picture of Bay on the night of the arrest, and there's no question, as I stand here now, that these are different people, and there's no question that Bay is darker skinned and he's a little heftier, even though he's basically the same height, but the question we have right now is, from Officer Powell's perspective, in a chase, standing there, 20 feet away, when he sees two gentlemen who look like this, does he instantly say, who's wearing the right jacket, who's in the right place, does he instantly say, that's not the guy? Does he stand there and say... We're not at the arrest yet. Exactly, we're at a Terry stop, Your Honor, and what the Supreme Court said in Adams v. Williams, I think we quoted this, but you can find 20 other quotes like this, Adams v. Williams says, a Terry stop is a brief stop of a suspicious individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information. That is exactly... The status of that to determine... Let's assume, I'm not suggesting this is in the record, but let's assume that the NDT photo or image that Officer Powell saw was of a very, very old white man, but of the same build that from the background could mistake that person for Bay, and then two minutes later, Bay turns around, and the officer says, oh, this is not a very, very old white man, this is a kind of early 20 black male, and at that point in time, I think you'd agree, the officer knows Bay is not the IRB for the guard. That's correct, and in fact, Your Honor, that's exactly the next thing I was going to say. I was going to use the example of a 50-year-old woman who turns around. That's good, let's go with yours. Okay, and when that 50-year-old woman turns around, yes, it's over, that's not him, let's get back to work, we need to find the guy. But instead what he sees is an African-American male. Now, again, this is from 20 feet. The facial features might be different, he might sense that, but then he's also dealing with the exact correct garments in the exact right place. Let's go back, now he's not yet arrested. Correct. So let's go back to your scenario of a 50-year-old woman who's turning around. In some way, there's a gradation of that, and at some point on those two continuums, between your and my hypothetical and the distinction we have before us here, we get to the point where the similarities are sufficient that the difference in appearance does not necessarily suggest to the officer, oh, this is not the guy, so he takes him back and he gets to show up. But isn't it the government's burden to show that there's a sufficient similarity between what they look like and the image that the officer saw in the NDT to show that when he finally saw they's face, that was not enough to be able to reasonably say, okay, why are you weighing up the guy? It is, Your Honor, but as we move along that continuum, we look at the purpose of the Terry stop. This is a brief investigatory stop. What we look at is the identity here. That's right, and with the Fourth Amendment, we were told over and over by our betters upstairs that the touchstone of the Fourth Amendment is reasonableness. What's reasonable? Is it reasonable for Officer Powell to look at him and say, hmm, I'm not sure about that skin color, I don't know about his size, maybe he's off a bit, or does he do a Terry stop for exactly the reasons the Terry stop was created, which is to say, let's just freeze this, we can stop him for a moment. If we're concerned about a gun, we can pat him down and we can figure this out. And Officer Powell did the reasonable thing. And what shows you that also is what the officers did in the minutes afterwards. Yes, they found a gun and they were going to hold him for that, but first they still had to work out, was this Amir Robinson who ran out of the car, because that's a whole different set of crimes. And so Madera pulls up, who had been at the scene, and what Madera testifies is, I pulled up the picture on the computer again, and I looked at this guy and I said, it's not him. Now that's appropriate and that's what they should be doing, but even that wasn't strong enough, apparently, in the officer's view. Because Officer Powell took the additional step, and we heard this from both Powell and Fritz, that Powell drove Bay a block back to where the scene started, and to show him in person to Fritz. Remember, Fritz is the only officer who actually saw Amir Robinson run out of the car. And he presents him to Fritz, and Fritz immediately says, not him. Immediately. This is good police work. This is what the police are supposed to do, and this is what the Supreme Court in Terry permits them to do. Not to just try to make a judgment, 50-year-old woman, easy. African-American man, same height, age is off by 10 years, skin color is off. No. That's the time to say, we are permitted to find out, is he the right guy? Because if he is, remember, this is a man who ran out of a car, that had three armed people in it, at 10 at night, in a dangerous section of Philadelphia. We want police officers to apprehend these people, and to stop this conduct, and to protect the community. That's the balance that's being struck here, and that's the balance that Terry strikes. And so that's where we stand, is that you had a good description. I could go further about, I don't know if the court's interested, about why this is such a valid description, and why it's appropriate to stop that person and have them turn around. The last point that my friend made concerned the high crime area. Obviously, that's of incremental relevance here. The district court devoted one sentence to it. I think the court should be hesitant to go as far as the defense suggests here, to just declare a rule that in ID cases, high crime area doesn't matter. This court in Goodrich, in Graves, has repeatedly cited high crime area as a factor in ID matters. It could be a factor, and that usually is a factor, especially given the detailed record here in the suppression area, about how these officers are going to be related to the kind of squadron they're on. They're specifically designed to be captained, so they can go wherever manpower is needed the most. But I certainly noticed that, and I heard some of my colleagues have too, that there seems to be a propensity to associate high crime areas with black folks living there, no matter what the socioeconomic status is. My guess is that in the generic way it's used, certain sections of German town, not German town, but parts of it are a high crime area. West Point area, Chestnut Hill, would be high crime areas, because lots of black folks live there, even though they're incredibly affluent areas. That's, I think, what Mr. Schweitzer is concerned about, and I share that concern. In the Pittsburgh case I mentioned, which may have been a gift card, where the district court judge was promptly offended because his neighborhood was being brought into what was a high crime area. It was a middle-class black neighborhood. Well, I think Your Honor knows that all of us share that concern also. I don't know about this, but I think you share the concern. Well, I do. I don't think everybody does. So if you share the concern, why not go there? Well, I'm saying that in this case, I'm saying that it's of incremental relevance, but it's not what we're relying on. Is it relevant at all? I think it is. I have to follow the precedent of this court, which says that in this situation, yes, it's of some relevance that you see a person in a high crime area, making it more likely that they're involved in criminal activity. Given that you're looking for a person in a crowd of people, I don't think it gets you very far here at all, and the district court certainly didn't rely on that. I do want to answer, though. I do think there was a point, especially in the defense reply brief, that was a bit regrettable in suggesting that we have some kind of racial bias here. Besides the fact that that's personally offensive, it's just not how anybody has argued this case or how the district court addressed it. This court properly, in the Goodrich case, found a rural area somewhere in central Pennsylvania to be a high crime area because they were stealing a particular type of ammonia from a plant over and over again, and therefore people lurking near there late at night with tools were in a high crime area, and it was more likely it was them. That was an ID case in which high crime area was relevant. So that's why all I'm saying is you need to be hesitant, I suggest, in saying that it's never relevant. It is a marginal, very small relevance here, and it would not carry the day here. If that were the only fact, certainly we would not prevail. But there is nothing racial about the statement by the police officers that I think the officers cited specific shootings and incidents that had happened within blocks of this very spot. And, again, that's what they're there to protect against when three guys roll up and each of them have guns on them. That's the problem. Just to sum up, Your Honor, I think a very apt point Your Honor makes, that we have a very detailed record here. It's very easy, and I've noted this before in other arguments, it's very easy to sit here in this very quiet courtroom where we have this detailed record in front of us, where we have all the time we need to discuss this with each other, and we have no concern that anybody's going to run around here or pop up with a gun or anything like that. It's a whole different matter for someone like Officer Powell to make a judgment on the spot, at 10 at night, a block away from where two people have run, leaving guns behind in the car. That's where the officer has to use his judgment and make decisions. And what the Supreme Court permits him to do, and this Court permits him to do, is what is reasonable. And a Terry stop is a very incremental thing. It relies on a standard much less than preponderance in the evidence or probable cause. You need an articulable suspicion, something more than a hunch. He had that. He had a person of the general build, wearing the clothes in the spot he thought it would be, within minutes of the incident. And he's permitted to complete his investigation. And that means stopping him, making sure, doing the show-up. The rest was before the show-up. Excuse me? The rest of it was before the show-up. Well, it so happened he had a gun. But it's clear from the record they were going to do the show-up because they had to complete their investigation regarding that flight from the car. And so I submitted that it would not be appropriate in these circumstances to second-guess the officer just based on what we see in the facial distinction where the officer is seen as from 20 feet away at night. But my concern is we don't know what the distinction is because that photo was never introduced into evidence. That's correct. I think we can accept. I mean, if we want to go back and put on more evidence, we could get probably photos more contemporaneous for Robinson. But I think that it's not going to get better for the defense than this. We do see that he is a younger man with lighter skin. But just based on this, I think it's fair to say what the district court said, which is there isn't enough of a distinction here to stop this investigation. Okay. Maybe this is not evidence. What I'm looking at now, seeing the records, mine is in color. See when you stop using paper, all the advantages that you have. Yes, that's very impressive. It is page 261 and 262 that were presented to the district court. There is a distinction. But, again, if you look at these two gentlemen and put yourself 20 feet away at night looking at the faces but also the clothing and everything else about the circumstance. You said 261 and 262 were presented to the district court. She said in her opinion that the MDT image was never introduced into evidence. It was. The image that was on the screen was never introduced into evidence. Correct. Exactly. This was introduced into evidence by the defense at the suppression hearing. It's a picture of Robinson that's taken five months later when he's actually arrested when they find the right Robinson. And so the judge, I think, correctly says, when you're talking about the neck tattoo that he has, which I don't think you can remotely see at night from 20 feet away, but with regard to the tattoo and his hair and whether he has a beard or not, that she can't reach a judgment on. But I'm saying just on the basics, just looking at the basic distinction between these men and thinking about them wearing the right clothes 20 feet away, I think it would be derelict for an officer to say, I'm just going to walk away. And instead, or I'm going to stand here for a while and see what happens with this crowd of people. Instead, just to do what Terry allows, which is, stop, please, hold on for a sec, let's check your ID. Thank you very much. Thank you, Mr. Osmer. Should I see these guys from time, I think? Yes, please. Of course, stop, please, let me check some IDs. It's not exactly what happened here. I'm sorry. I said, of course, stop, please, let me check some IDs. It's not what happened here. But regardless, let me first say, of course, my friend and colleague, Mr. Osmer, is not racist. I would never suggest such. But I don't regret taking the position I did in the reply brief, which is that when we insist on reflexively applying a factor that actually has zero relevance and we're willfully blind to what happens as a result of that in terms of both the doctrine and what can happen in perceptions in the community, I think that's a bad thing. There is no precedent, absolutely no precedent, requiring that factor to be considered in this type of a circumstance. But I do think clarification is required. Very recently, the court in the Foster case, which was handed down after the briefing in this case, mentioned high crime area. Again, that case is distinguishable for all sorts of reasons. It's very much like Goodrich. But there, imported from Goodrich, this high crime area discussion, and I don't think it's appropriate. So I do think it would be helpful for the court to hear something on that. Now, what I heard from Mr. Osmer was a very impassioned and eloquent argument as to why Brown shouldn't be the law. Everything was right. The red coat was there. The height was there. What did we expect? This is a fast-paced situation. Exactly the same in Brown. Everything was right in Brown. But what was wrong? What was wrong was the description. The description was just not distinct. It was going to pick out a lot of people in Philadelphia. Same problem here. Again, the match. How can we expect someone to just say, hey, this isn't a match. It's okay. The terror stop was very low. It's a low bar. It's a friendly interaction. And why don't we just allow this because it's a fast-paced situation? Brown addresses that too. Brown says it's enough. The discrepancy of a full beard when everyone knows, and it would be reasonable, if somebody's got a big, bushy beard, that's going to come out in the description. I think we can all settle on that, and that was a premise of Brown. Brown said those two things alone, the age differential, the wild age differential, and the beard, when there was no description of facial hair, that's enough to violate the Fourth Amendment. What guidance do we give? I assume you're right in this opinion. What guidance would you give the police in terms of what they can do in this scenario? I think you said earlier they should follow him for a while. Well, you know, this Court isn't in the habit of giving instructions to the police, but I think what would have happened was what would have been permissible here is if there was some other indication that Mr. Bay had either, you know, two things. First of all, be conscious of how distinctive your description is, and that has to inform what your actions are. What should Powell have done here? Powell, in this situation, should have rolled up on lids and either done one of two things, laid back and said, oh, there's a guy in a red, he kind of matches the description, it's a vague description, but matches the description. I'm going to watch it. He might have a gun. I'm going to watch it. And, you know, does he do something else? The exact same in Graves. Exactly what they did in Graves. A guy with a gun. Terrible. Awful. You know, exigent circumstances, and what did the police officer do there? Something very commendable and not violative of the Fourth Amendment. Or he could have done a consensual encounter, and that's fine. And Mr. Zalzberg is probably scoffing behind my back. He's not, actually. But that's permissible, too. Look, there's a gun involved in this situation. I don't, you know, I'm not going to tell an officer. I wouldn't recommend that the court tell the officer to go up and whatever. But I think the most prudent thing here would have been further observation. And that's not some crazy notion. That's way out of what. It's a pretty crowded scene, though, isn't it? The reason it was crowded, there were a few people outside the bar. The reason it became a little chaotic was because Officer Powell escalated this into something we see on the nightly news that turns out bad. That's what happened here. And then you had all the people start pouring out of the bar. What are you doing? He didn't do anything wrong. What's going on? And then Officer Powell is mouthing off to the people. That's not to denigrate. It escalates. It gets heated. You know, we're lucky nothing happened. But it wasn't because, as Officer Powell rolled up to this situation, it was this chaotic nightmare. He actually created a good measure of what was going on. It's tragic. You can't really smile at this kind of thing because someone could have gotten seriously hurt. But it's kind of almost like a keystone. That's the kind of thing that people running out of the car all over you, arrest one guy, then he's going to disappear when you get around. That's right. The overall scene, I'm not trying to belittle. The officers here had a difficult job. It is high stakes. It's fast moving. I agree with Mr. Zelsmer on all of that. What I'm saying is it doesn't override. It's just not carte blanche at that point. And we do have a benchmark. I didn't hear anything about, oh, Brown's different because of this. Mr. Zelsmer said, well, it was red. Well, in a town where we have the Phillies and the Sixers, I don't think red is really that distinctive or constitutionally relevant. When we had him brown, look, he's wearing a dark hoodie, and the court in Brown said, you know what, that's not distinctive enough. So the red doesn't, in my mind, cut it in terms of distinguishing Brown. And I heard nothing else. In terms of, that's a very difficult case. To me, the attorney's doctor show is closer than you may be conceding that it is. It doesn't really matter. But I'm trying to put myself in the officer's shoes, which is an impossibility, but he's trying to do that for purposes of the intellectual exercise. That close to the time the car was stopped and the guy ran, and then you see a red coat and a jacket and a hoodie, it's kind of hard for me to accept that the officer just kind of followed the person because one person may have disappeared in the crowd, got lost. In the case I'd rather like to assume this guy may well have a gun, but why did he get lost in the crowd? So I approach him. I get it, Your Honor. And Brown was three minutes and four blocks. But there's only one thing that can be done. We look at the circumstances, the totality. And also, the totality here, again, don't forget, there are officers all over the place at this point. It's not just Officer Powell on a solo mission to find Robinson before he before. In Powell's mind, that might even make it more imminent that he find out if this guy's got a gun on him because it is escalating really quickly. Things are getting out of hand. People are coming out of a bar. Well, these officers are arriving. I agree. I agree with all of you, Your Honor. My only point was it didn't have to be that way, and it shouldn't have been that way if the Fourth Amendment had been. If Officer Powell had done what he should have done, it wouldn't have been exactly like that in that immediate scene. But regardless, my only point was, Your Honors have asked me several times, well, what was Officer Powell supposed to do? And I said, well, this requires on this vague tip and this degree of, you know, not so great of a match, it requires something else before you pull a gun and stop the guy. So he should have waited and watched or followed him? He could have. Yeah, I mean, that's what they did in graves. I mean, police do this all the time. And, again, what's the opportunity cost for that? Typically we'd say there could be a gun on the street, a guy's going to get away, anything like that. And all I'm saying with the totality of the circumstances here is, you know, this wasn't a solo mission. So you had other people looking and everything else. So the opportunity cost of watching Mr. Bay for a few minutes to see if anything happened was low, compared to another case which we might imagine where it's a hot pursuit and nothing else is going to happen. So, again, you know, important job for the officers. I'm not denigrating that. I'm not saying these are easy calls. But we do have to draw a line somewhere. And what I think is critically important here is we're not writing on a blank slate. Brown has drawn some very clear lines here. And I would urge the court to take a careful look at the facts in that case because I do believe they are materially not distinguishable. Thank you, Your Honors. Thank you. It's not surprising. A really excellent argument. I think that's also for Larry because I think a really difficult case is really a fine argument. It's helpful, although the fine argument, at least in my mind, makes it all the more difficult. Thank you.